UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
GELIMAN, S.A.,                          :
                                        :
                    Plaintiff,          :
                                        : 05 Civ. 7102 (LTS)(THK)
                                        :
         -against-                      :
                                        : **REPORT AND RECOMMENDATION**
DESIGN IDEAS, LTD.,                     :
                                        :
                    Defendant.          :
---------------------------------------X

**TO: HON. LAURA T. SWAIN, United States District Judge.**
**FROM: THEODORE H. KATZ, United States Magistrate Judge.**

Plaintiff Geliman, S.A. ("Geliman") brought this action for unfair competition, false designation of origin and trademark infringement, breach of contract, theft of trade secrets, and tortious interference with business relationships, against its former business partner, Design Ideas, Ltd. ("DI"). The Court's jurisdiction was invoked under 28 U.S.C. § 1331(a) and § 1338(a), on the basis of federal trademark and Lanham Act claims.

With this Court's assistance, over the course of nearly an entire year, the parties reached an agreement to settle the action. Nevertheless, before a written settlement agreement could be executed, DI became aware of a number of facts which led it to conclude that Geliman had made material misrepresentations to it and the Court, and had undertaken actions which, according to DI, undermined the basis for the parties' settlement agreement, as well as the Court's subject matter jurisdiction. DI has therefore moved to vacate the settlement agreement and dismiss the action, arguing that: (1) Geliman committed fraud on the court; (2) Geliman's

actions have created severe risks to DI in the event the agreement is enforced; (3) Geliman never had standing to bring, and the Court never had subject matter jurisdiction over, this action. Geliman responds that DI has been improperly attempting to extricate itself from the settlement agreement ever since the original agreement was reached, and the instant motion is just another such attempt.

The motion has been referred to this Court for a Report and Recommendation, pursuant to 28 U.S.C. § 636 (b)(1)(B) and (C). For the reasons that follow, the Court recommends that the action be dismissed for lack of subject matter jurisdiction.

### BACKGROUND

Facts Leading To The Complaint

Geliman, an Argentinian company, manufactures and distributes a decorative novelty product, made out of a polymer gel, that can be produced in a wide variety of colors, sizes, and shapes. The gel has adhesive properties which permit its adhesion to smooth services, such as windows and mirrors, and its removal without leaving any marks. (See Verified First Amended Complaint ("Compl."), ¶ 8.)[1] The product was marketed in Argentina under the name "GEL&MAN," which is pronounced "Geliman." In 2002, Geliman entered into a verbal distributorship agreement with DI, for the marketing of the Geliman product in the United States and Canada,

---

[1] The gel product was invented by Alfredo Tubert and his wife, Irene. They, along with Ian Haftel, are the principal owners of Geliman, S.A.

2

and the registration and joint ownership of the "GELGEMS" trademarks, which included "GELGEMS," "GELMANIA," "GELTASTIC," and "GELRIFIC." (See id. ¶¶ 11-14.) In the agreement, Geliman was acknowledged to be the exclusive owner of the Gel&Man Trademark, and agreed to license DI to use the trademark in the United States and Canada. In August 2003, Geliman and DI verbally entered into a joint venture agreement, whereby they agreed to jointly develop a manufacturing facility in China, to be owned equally by DI and Geliman. In order to set up the Chinese manufacturing facility, Geliman disclosed its proprietary manufacturing process to DI, and DI agreed to contribute $100,000 toward the joint venture. Geliman agreed to pay the joint venture a royalty on all sales of product manufactured in Geliman's Argentinian factory which were sold outside of Argentina. (See id. ¶ 18.)

In the process of attempting to commit their agreement to writing, as they did in this action, the parties found themselves at an impasse over a variety of terms, including the need for cash contributions to the endeavor, royalty payments, ownership of the trademarks, and the territory in which the joint venture was authorized to sell. Over time, DI's purchases of the product from Geliman decreased, and Geliman concluded that (1) DI was marketing or attempting to market the Geliman product to Geliman's clients, and in locations where Geliman had not authorized DI to sell, and (2) DI had begun the unauthorized operation of the Chinese factory,

3

utilizing Geliman's trade secrets. (See id. ¶¶ 22-41, 79-82.)

The parties never finalized a written joint venture agreement, and this action followed.

The Settlement Agreement

The original Complaint was filed on August 1, 2005, and the Verified First Amended Complaint was filed and served on November 28, 2005, along with a motion for a preliminary injunction. Two days later, on November 30, 2005, the parties appeared at a settlement conference with the Court. After a full day of negotiations, an oral settlement agreement was reached, with some issues unresolved. (See Settlement Transcript, Exhibit ("Ex.") I to Declaration of A. John P. Mancini, Esq., dated July 20, 2007 ("Mancini Decl.").) The primary terms of the agreement are as follows:

(1) The parties agreed to divide up the territories where each would be permitted to sell the gel products in issue. DI was given the exclusive right to sell the products in the United States, Canada, Mexico, and the United Kingdom. Geliman has the right to sell the products in the rest of the world. At the end of the first day of discussions, however, there was a strong disagreement about whether DI would be permitted to sell the product in Thailand, with DI asserting that the issue was a "deal breaker."

(2) The parties agreed that they would share the intellectual property rights in the prior, existing product designs, but that each would have the exclusive rights to any future designs each created. DI would own 100% of the GELGEMS Trademarks within the DI territory, and would have the exclusive use of those marks in its territory. Geliman would own 100% of the Gel&Man Trademarks ("Gel and Man" and "Geliman") worldwide, and would have exclusive use of those trademarks in the Geliman territory (which does not include

4

the United States).

(3) Geliman is entitled to 5% of all of DI's gross sales of the product made during a three-year period commencing January 1, 2006 — payable quarterly. Audits of DI's sales figures are to be conducted by an independent auditor.

(4) DI agreed to transfer to Geliman all intellectual property rights in the brands outside of the DI territory, and Geliman agreed to bear the costs of such transfers.[2]

(5) The parties agreed to release all monetary claims against each other, except that DI is required to pay for any outstanding orders it had placed with Geliman.

(6) DI agreed to make no representations about who the inventor of the product was, other than Alfred Tubert and Irene Elordi (Tubert's wife) — two of the principal owners of Geliman.

(7) The parties' respective websites would make clear from whom the product could be acquired in different countries, and Geliman would have the right to exclusive use of the www.gel.gelgems.net website.

(8) DI is to own 100% of the China factory, and Geliman agreed to license DI's use of the Geliman trade secrets for manufacture of the product in the China factory. The license for the use of the trade secrets is non-transferable, and the trade secrets are to be kept confidential.

(9) The parties agreed that once they reached agreement that evening on the outstanding issues, they would work in good faith to reduce the settlement agreement to writing. If there were any disputes over the terms of the written agreement, the parties agreed to allow the Court to resolve them.

(See November 30, 2005 Settlement Transcript, Ex. I to Mancini Decl.; Term Sheet for Settlement of Disputes Between Geliman, S.A. and Design Ideas, Inc., Ex. 21 to Declaration of Edward Griffith, Esq., dated Aug. 23, 2007 ("Griffith Decl.".)

---

[2] It appears that DI had registered various marks in a number of countries in Europe.

Within a matter of days, the parties began drafting written versions of the oral agreement. In the process of drafting a written agreement, the parties found that several substantive disputes remained, as to which they sought the Court's assistance. Following another lengthy conference with the Court, on March 21, 2006, the parties reached and executed a Supplement To The Settlement Agreement ("Supplement"). (See Ex. J to Mancini Decl.) The Supplement calls for DI to make a payment in order to secure product being held by customs authorities; it reduced by $50,000 the commission payments DI is required to make to Geliman; Geliman granted DI an exclusive license to sell the gel products in the Republic of Ireland, for five years, and a non-exclusive perpetual license to sell in the Republic of Ireland thereafter. During the exclusive license period, DI is to pay commissions of 5% on all gross sales in Ireland.

Nevertheless, in the process of drafting an integrated, written settlement agreement, the parties once again found themselves disagreeing on a number of provisions, and, as had been agreed to in the initial settlement agreement, those disputes were submitted to the Court. On August 15, 2006, the Court issued a letter addressing most of the remaining disputes.

Before a written agreement could be finalized, however, on November 17, 2006, Geliman revealed that, in August 2006, it had filed a "concurso" in Argentina, which is comparable to a United

States bankruptcy proceeding.[3] Once it became aware of the concurso, DI understandably was hesitant to proceed with finalizing the settlement agreement, as it implicated what were thought to be Geliman's assets, as well as Geliman's authority to execute the settlement agreement. In addition, DI was not prepared to agree to proposed revisions in the settlement agreement that would, in effect, have another company, Dynamic Window S.A., controlled by Geliman's President, Alfredo Tubert, step into the shoes of Geliman.[4]

Subsequently, the parties agreed to jointly retain, at Geliman's expense, Dr. Alfredo L. Rovira, an expert in Argentinian law, to advise them about the impact of the concurso, if any, on the settlement agreement. Dr. Rovira submitted a report to both parties on April 2, 2007, and an English language version of the report was provided to DI on May 7, 2007 ("Rovira Rept."). (See Ex. N to the Mancini Decl.)

The parties disagree on the implications of the opinions expressed by Dr. Rovira. It cannot be disputed, however, that, in large part, Dr. Rovira's conclusions are based upon certain facts he found with regard to Geliman, that came as a surprise to DI.

---

[3] The decision to file the concurso was formally reached by Geliman's board of directors on July 20, 2006.

[4] Notwithstanding the parties' disputes, DI has made royalty payments to Geliman under the settlement agreement in an amount exceeding $200,000.

7

Foremost, Dr. Rovira explained that Geliman, although the Plaintiff

in this action, did not own the trade secrets and trademarks that

are the subject of this action. Rather, they were owned by

Geliman's principals — Alfredo Tubert, Irene Elordi, and Ian

Haftel. For example, at one point in his report Rovira states:

> Geliman S.A. is the claimant in the Court Action filed
> against Design Ideas, pursuant to which Geliman S.A.
> seeks to recover the rights invoked by Haftel, Tubert and
> Elordi regarding the Trademarks, the know-how and the
> trade secrets which would have been illegally used by
> Design Ideas. However, from the former narration, it is
> not evident that Geliman S.A. has any title to claim such
> rights for its own account or that there is explicit
> authorization of the owners in interest to file the court
> action.

(Rovira Rept., at 10-11.)

Further, in opining that the concurso proceeding had "no

effect on the agreement to transfer intellectual property to DI,"

Dr. Rovira stated:

> If the Settlement Agreement is merely a formal instrument
> ratifying the Agreement, then the Insolvency Proceeding
> has no relevant effect on the Settlement Agreement
> either. Based on the facts and rights described above,
> it can reasonably be inferred that Geliman S.A. has not
> acted on its own behalf in the Court Action but rather on
> behalf of the owners of the intellectual property rights
> which are the subject matter of the complaint.
> Accordingly, Geliman S.A.'s Insolvency Proceeding would
> be foreign to and have no effect on the Agreement and the
> Settlement Agreement.

(Id. at 24-25.)

Rovira went on to observe that (1) "the real plaintiffs of the

claim are Tubert, Elordi and Haftel" (id. at 25); (2) in the

Verified Amended Complaint, "Geliman is described in uncertain and

8

confusing terms, contrary to the documents evidencing otherwise, as the owner of the trademarks that did not legally belong to it" (id.); (3) "[a]dding to this confusion, the Declaration of Alfredo Tubert . . . gives the impression that he assigned the GelGems trademark to Geliman. However, as stated in the report, ownership of the GelGems trademark corresponds to Tubert, and there are no records of a legal assignment of this trademark to Geliman S.A." (id.).

In his report, Rovira further referenced an Assignment Agreement, entered into on February 10, 2006, where Tubert, Elordi and Haftel are acknowledged to be the owners of the intellectual property in issue in this action. In the agreement, they assigned those rights, as well as all rights under the settlement agreement with DI, to Dynamic Window. (See id. at 12-14.) Neither DI nor the Court were aware of the Assignment Agreement, or that all of the rights under the settlement agreement now belong to a non-party to this action.

In a letter dated August 8, 2007, Tubert and Elordi notified the concurso Trustee that Geliman did not own the intellectual property in issue in this litigation, and further advised the Trustee of the litigation and the settlement agreement.

Lacking comfort with Dr. Rovira's conclusion that the insolvency proceeding was not likely to have any impact on the settlement agreement — because Geliman, the insolvent, did not own

the assets being distributed in the settlement agreement — DI retained another expert on Argentinian law — Dr. Hector Alegria. In July of 2007, Dr. Alegria issued a report (see Mancini Decl., Ex. R) that concluded, inter alia: (1) the settlement agreement could be considered ineffective since it granted significant rights to Geliman and occurred during Geliman's bankruptcy reorganization proceeding; (2) if the settlement agreement was executed, DI could be charged with taking part in a concealment of assets, to the detriment of other creditors of Geliman; and (3) if it were shown that Dynamic Window belongs to a business group that includes Geliman, Geliman's bankruptcy could be extended to Dynamic Window, as well as to Tubert and Elordi. (See id. at 5-6.)  Alegria also opined that since there were no corporate records which authorized Tubert and Elordi to assign Geliman's intellectual property rights, as well as all rights it acquired under the settlement agreement, to Dynamic Window, that agreement could be considered "null and no effect." (See id. at 8-9.)[5]  In addition, Alegria raised concerns about Dynamic Window being both a creditor and debtor in relation to Geliman, and both Geliman and Dynamic Window appearing to be controlled by Tubert, thus constituting "at least a merger of interests between the parties." (Id. ¶ 36.)  Alegria further voiced

---

[5] Alegria also voiced concern about Geliman's failure to disclose the Assignment Agreement and settlement agreement to the bankruptcy Trustee. (See id. ¶¶ 51-52.)  Notification was provided to the Trustee the following month.

concern that the payment Geliman received under the Assignment Agreement was inadequate consideration for the rights it was transferring, and that the transfer of its rights to Dynamic Window could be viewed as a concealment of assets. (See id. ¶¶ 59-65.) In particular, Alegria stated that "the acknowledgment of rights granted to third parties, the meager consideration for which such rights were transferred to those third parties, and the small amount paid in consideration for management dealings, can be relevant information for purposes of meeting the requirements for starting a claw-back action" by the bankruptcy trustee. (Id. ¶ 71.)

In response to the Alegria Report, Dr. Rovira submitted two supplemental reports. (See Griffith Decl., Exs. 29 & 30.) Dr. Rovira disputes that DI could expose itself to liability by executing the settlement agreement because, as he initially reported, Geliman never owned the intellectual property assets being transferred, so its assets would not be diminished by the settlement agreement. Moreover, DI could not be held liable for the diminution of Geliman's assets because it had no intent to defraud. Rather, according to Rovira, in the event that the Assignment Agreement between Tubert and Elordi on the one hand, and Dynamic Window, on the other, was found to be ineffective by the concurso judge, only Geliman, Tubert, Elordi, and Dynamic Window could be liable. (See Second Opinion Letter of Dr. Alfredo L. Rovira, dated Aug. 14, 2007 (Griffith Decl., Ex. 29), passim.) In

the conclusion of his Second Report Rovira appears to say that the settlement agreement and Assignment Agreement could not be declared invalid, but their effects could be non-enforceable with respect to third-party creditors. (See id. ¶ 31.)

After Tubert and Elordi notified the concurso trustee about the settlement agreement and Assignment Agreement, Rovira issued a supplemental opinion letter. (See Supplemental Opinion Letter, dated Aug. 21, 2007 (Griffith Decl., Ex. 30).) The report indicates that on August 8, 2007, Tubert and Elordi provided notification to the concurso Trustee (see Griffith Decl., Ex. 1), and, on August 13, 2007, the Trustee acknowledged the notification and that the rights disputed in the litigation were not Geliman's assets (see id., Ex. 2). Thus, according to Rovira, the settlement agreement would not be regarded as an inappropriate disposition of Geliman's assets, and there could be no liability on DI's part. (See id. ¶¶ 8-10.)

As a final factual coda, Geliman's counsel represents that Geliman's creditors recently approved a plan of reorganization for Geliman, which should lead to the termination of the concurso, and eliminate any risk of a liquidation proceeding and possible invalidation of the settlement agreement or Assignment Agreement. The formal conclusion of the concurso has, however, not yet occurred. (See Letter from Edward Griffith, Esq. to the Court, dated Nov. 13, 2007.)

## DISCUSSION

Although the settlement agreement was never reduced to a final integrated writing, the parties do not dispute that their on-the-record oral agreement, as supplemented by the written Supplement to the settlement agreement, and the Court's letter addressing various disputes the parties had about the terms of their agreement, is a binding agreement.[6]  They disagree, however, as to the legal standards that must be met in order to vacate the agreement, as well as whether the agreement should be vacated and the action dismissed.  Indeed, in the course of briefing the instant motion and replying to each other's submissions, the parties' legal arguments have shifted, just as their business relationship kept shifting.[7]  Because the Court found that, despite numerous submissions, the parties had still failed to adequately address critical issues, they were directed to supplement their submissions, and the Court heard oral argument on January 23, 2008.

DI has made several arguments as to why the settlement agreement should be vacated and the action dismissed.  They

---

[6] This understanding is evidenced by DI's payment to Geliman of over $200,000, pursuant to the terms of the settlement agreement.

[7] For example, the parties initially devoted substantial attention in their written submissions to the standard under Federal Rule of Civil Procedure 60 that applied to DI's motion to vacate the settlement agreement.  They ultimately came to recognize, however, that since there was no court order or judgment being modified, Rule 60 was inapplicable.

include: (1) the disclosure that Geliman — the named Plaintiff in this action — never owned the trademarks and other intellectual property assets in dispute, despite statements in the Complaint to the contrary,[8] combined with the fact that Geliman never registered or used the trademarks in issue in the United States, require that the action be dismissed because Geliman never had standing to bring the action and, therefore, the Court never had subject matter jurisdiction; (2) by failing to disclose the true ownership of the trademarks, either in the Complaint or during the settlement discussions, Geliman committed fraud on the Court; (3) by failing to disclose (a) the true ownership of the marks in issue, (b) Geliman's filing of a concurso proceeding in Argentina, and (c) Geliman's Assignment Agreement with Dynamic Window, Geliman engaged in misleading, if not fraudulent conduct, and that requiring that the parties to actually execute and carry out their oral settlement agreement, reached before these facts were known, would be an injustice which the Court has inherent authority to remedy; and (4) by filing the concurso and entering into the Assignment Agreement, Geliman has exposed DI to serious risks and the possibility of duplicative claims by Geliman's creditors if DI proceeds with the settlement agreement.

None of these arguments are frivolous and, despite Geliman's claim that DI is merely looking for an excuse to extricate itself

---

[8] See, e.g., First Amended Complaint ¶ 43 n.1.

from the settlement agreement, Geliman has certainly given DI ample fodder for its position. Nevertheless, as the Court made clear at the oral argument of the motion, there is a fundamental jurisdictional problem, other than those raised by DI. The outcome of the instant dispute does not turn on whether or not the Court originally had jurisdiction over this action, which involves complex issues relating to Geliman's standing under the Lanham Act. Instead, the dispositive question is whether, in light of the Assignment Agreement, by which Geliman assigned all of its rights under the settlement agreement, as well as its rights to the intellectual property at issue in this litigation, the Court now has jurisdiction over this action. This is the first issue the Court must resolve, because if jurisdiction is currently lacking, the Court can take no action with respect to the settlement agreement and the action must be dismissed. See Rule 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.") (emphasis added); see also Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 571, 124 S. Ct. 1920 (2004) ("Challenges to subject-matter jurisdiction can of course be raised at any time prior to final judgment."); Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94-95, 118 S. Ct. 1003 (1998) ("The requirement that jurisdiction be established as a threshold matter . . . is inflexible and without exception.").

> Questions of jurisdiction, of course, should be given
> priority-since if there is no jurisdiction there is no
> authority to sit in judgment of anything else.
> Jurisdiction is power to declare the law, and when it
> ceases to exist, the only function remaining to the court
> is that of announcing the fact and dismissing the cause.

Vermont Agency of Natural Resources v. U.S. ex rel. Stevens, 529
U.S. 765, 778-79, 120 S. Ct. 1858, 1865-66 (2000) (internal
citations and question marks omitted).

I. Standing

A. Applicable Law

"In every federal case, the party bringing the suit must
establish standing to prosecute the action. In essence, the
question of standing is whether the litigant is entitled to have
the court decide the merits of the dispute or of particular
issues." Elk Grove Unified School Dist. v. Newdow, 542 U.S. 1, 11,
124 S. Ct. 2301, 2308 (2004). Standing is one necessary element of
subject matter jurisdiction, because it goes to the issue of
whether there is a "case or controversy" between the parties. See
Elk Grove, 542 U.S. at 11, 124 S. Ct. at 2308 ("[O]ur standing
jurisprudence contains two strains: Article III standing, which
enforces the Constitution's case or controversy requirement, and
prudential standing, which embodies judicially self-imposed limits
on the exercise of federal jurisdiction.") (internal citations
omitted); Arizonans for Official English v. Arizona, 520 U.S. 43,
64, 117 S. Ct. 1055, 1067 (1997) ("Standing to sue or defend is an
aspect of the case-or-controversy requirement."); Simon v. Eastern

16

Kentucky Welfare Rights Org., 426 U.S. 26, 37, 96 S. Ct. 1917, 1924 (1976) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases and controversies. The concept of standing is part of this limitation.").

"The case-or-controversy requirement subsists through all stages of federal judicial proceedings . . . The parties must continue to have a personal stake in the outcome of the lawsuit. . . . This means that throughout the litigation, the plaintiff must have suffered or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." Spencer v. Kemna, 523 U.S. 1, 7, 118 S. Ct. 978, 983 (1998) (internal quotations omitted); accord Arizonans for Official English, 520 U.S. at 67, 117 S. Ct. at 1068 ("To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review.") (internal quotation marks omitted); Gollust v. Mendell, 501 U.S. 115, 126, 111 S. Ct. 2173, 2180 (1991) (same).

In order to have constitutional standing, "[a]t an irreducible minimum . . . the plaintiff [must have] suffered an injury in fact - an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent not conjectural or hypothetical." Conn. v. Physicians Health Servs. of Conn., 287 F.3d 110, 116 (2d Cir. 2002).

> The Article III limitations are familiar: The plaintiff
> must show that the conduct of which he complains has
> caused him to suffer an injury in fact that a favorable
> judgment will redress. Although we have not exhaustively
> defined the prudential dimensions of the standing
> doctrine, we have explained that prudential standing
> encompasses the general prohibition on a litigant's
> raising another person's legal rights, the rule barring
> adjudication of generalized grievances more appropriately
> addressed in the representative branches, and the
> requirement that a plaintiff's complaint fall within the
> zone of interests protected by the law invoked.

Elk Grove, 524 U.S. at 12, 124 S. Ct. at 2308-09; accord Leighton
Tech. LLC v. Oberthur Card Sys., S.A., No. 04 Civ. 2496 (CM), 2007
WL 2230157, at *1 (S.D.N.Y. July 11, 2007) ("Before a federal court
can consider the merits of a legal claim, the person seeking to
invoke the jurisdiction of the court must establish the requisite
standing to sue. . . . The question of standing to sue is a
jurisdictional one.") (internal citations omitted). "In addition,
'prudential' principles of standing require that 'the plaintiff
generally must assert his own legal rights and interests, and
cannot rest his claim for relief on the legal rights or interests
of third parties.'" Es-Tee Realty Co., LLC v. Soumekhian, No. 04
Civ. 3482 (CBA), 2006 WL 2860810, at *4 (E.D.N.Y. Sept. 29, 2006)
(quoting Valley Forge Christian Coll. v. Ams. United for Separation
of Church and State, 454 U.S. 464, 474, 102 S. Ct. 752 (1982)).

"Closely related to standing is the doctrine of mootness. A
case is moot when a plaintiff who had standing to commence an
action in federal court because he had a sufficient personal stake
in the dispute at its inception gives up that stake in the course

of the litigation." <u>Schreiber Foods, Inc. V. Beatrice Cheese, Inc.</u>, 305 F. Supp. 2d 939, 949 (E.D. Wis. 2004), <u>overruled in part on other grounds</u>, 402 F.3d 1198 (Fed. Cir. 2005). "[I]f at any time in the course of litigation, a case or controversy ceases to exist, federal courts lose jurisdiction to adjudicate the matter." <u>Id.</u> at 954; <u>see also</u> <u>Arizonans for Official English</u>, 520 U.S. at 68 n.22, 117 S. Ct at 1069 ("Mootness has been described as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence.") (internal quotation marks omitted); <u>Di Giorgio v. Lee</u>, 134 F.3d 971, 974 (9th Cir. 1998) ("Whenever an action loses its character as a present live controversy during the course of litigation, federal courts are required to dismiss the action as moot.") (internal quotation marks omitted).

   B. <u>Application</u>

   Geliman, the sole Plaintiff in this action, executed the Assignment Agreement with Dynamic Window on February 10, 2006. In the Agreement, Geliman represents that it was the non-exclusive licensee (not owner) of the trademarks and manufacturing processes owned by Tubert, Elordi, and Haftel, and that it undertook the instant litigation as a representative of, and on behalf of, Tubert, Elordi, and Haftel (a fact not disclosed in the Complaint.) (<u>See</u> Assignment Agreement, Mancini Decl., Ex. P ¶ vi.) Indeed,

19

Geliman explicitly represents in the Assignment Agreement that although it filed the instant action, "this does not imply any claim for itself of any rights on the trademarks and/or the rights invoked." (<u>Id.</u>) Moreover, in the Assignment Agreement, Geliman, Tubert, Elordi, and Haftel assigned to Dynamic Window the trademarks at issue in this litigation, <u>as well as all of Geliman's rights under the settlement agreement with DI</u>. (<u>See id.</u> ¶ xiv.)

Thus, whether or not Geliman originally had standing to assert Lanham Act claims, an issue which DI vigorously contests, those claims have been extinguished by the settlement agreement, under which DI has already made substantial payments to Geliman. The parties explicitly agreed that, with the settlement agreement, they were releasing each other with respect to all claims that were or could have been asserted prior to the settlement agreement. (<u>See</u> Term Sheet (Griffith Decl., Ex. 21), at 4.) Thus, Geliman clearly no longer has standing to assert claims under either the Lanham Act or, by virtue of the Assignment Agreement, under the settlement agreement. All of its rights and obligations have been assigned to Dynamic Window, which is not a party to this litigation. "Typically, the assignee, obtaining the assignment in exchange for some consideration running from it to the assignor, replaces the assignor with respect to the claim of the portion of the claim assigned, and thus stands in the assignor's stead with respect to both injury and remedy." <u>Physicians Health Servs. of Conn.</u>, 287

F.3d at 117.[9]

It follows that this Court no longer has jurisdiction over this action because there is no case or controversy between DI and Geliman. Indeed, by the express terms of its own Assignment Agreement, Geliman voluntarily relinquished any and all rights or interests that it could have asserted in this litigation. DI argued this exact point, and it is the party that is actually seeking relief from the Court. (See January 23, 2008 Transcript at 30 ("There's no dispute that there's no standing now. There is no case in controversy now."); 32 ("[T]here is simply no case in controversy today, there is simply no standing, there is simply no subject matter jurisdiction.").)

In the absence of jurisdiction, this Court does not have the power to issue declarations about DI's and non-party Dynamic Window's (Geliman's assignee) rights or obligations under their private settlement agreement. Cf. Di Giorgio, 134 F.3d at 975 (party challenging statute that permitted possession of rental property held by bankrupt tenant, lost a legally cognizable interest in the outcome of the case when it voluntarily surrendered

_____

[9] Geliman's counsel asserted at the oral argument that Geliman remains a non-exclusive licensee of the Gel&Man mark. There is no support in the record for this assertion, and even Geliman's expert, Dr. Rovira, indicated that he found no evidence in the Geliman books and records of a license agreement. In any event, as a mere licensee, Geliman would derive all of its rights from its licensing agreement with Dynamic Window; it does not have rights under the settlement agreement, as they were all assigned to Dynamic Window.

21

possession of the property, notwithstanding settlement agreement between the parties, designed to permit judicial review, that provided for reinstatement of possession should the plaintiff prevail in the court action: "When the [plaintiffs] vacated the rental property, they lost their personal interest in challenging the Sheriff's use of § 715.050 to enforce a writ of possession against bankrupt tenants. Although the [settlement] Agreement was clearly an attempt to preserve a real case or controversy regarding the application of § 715.060, barriers to federal court jurisdiction cannot be overcome by agreement of the parties.").

The Court, therefore, is forced to recommend that the action be dismissed.

II. Sanctions

Even though this Court does not have subject matter jurisdiction over this action, DI correctly argues that the Court retains the inherent power to sanction a party for litigation misconduct. See Willy v. Coastal Corp., 503 U.S. 131, 139, 112 S. Ct. 1076, 1081 (1992) ("The interest in having rules of procedure obeyed, by contrast, does not disappear upon a subsequent determination that the court was without subject-matter jurisdiction. . . . [T]here is no constitutional infirmity under Article III in requiring those practicing before the courts to conduct themselves in compliance with the applicable procedural rules . . . and to allow the courts to impose Rule 11 sanctions in

the event of their failure to do so."); <u>Schlaifer Nance & Co., Inc.</u> <u>v. Estate of Andy Warhol</u>, 194 F.3d 323, 333 (2d Cir. 1999) ("The District Court clearly had jurisdiction to impose sanctions irrespective of the status of the underlying case because the imposition of sanctions is an issue collateral to and independent from the underlying case.").

DI therefore seeks, <u>inter alia</u>, the vacatur of the settlement agreement and dismissal of the action as a sanction for Geliman's "fraud on the court." While the Court agrees that this action should be dismissed for lack of jurisdiction, it concludes that the requested sanction of vacating the settlement agreement is inappropriate.

DI's claim for sanctions is based upon three developments that came to light after the initial settlement was reached: (1) Geliman's concurso proceeding; (2) the disclosure that Geliman never owned the trademarks in issue; and (3) the assignment of rights from Geliman to Design Window. The time-frame under which these events occurred is as follows: (1) on November 30, 2005, the oral settlement agreement was reached; (2) on February, 10, 2006, during the period when the parties were attempting to resolve various disagreements they had about their settlement agreement, Geliman and its principals assigned their rights under the settlement agreement to Design Window; (3) on March 21, 2006, a "Supplement to the Settlement" was agreed upon by DI and Geliman,

without DI knowing that Geliman had already assigned its rights under the settlement agreement to Design Window; (4) pursuant to the settlement agreement, DI began paying royalties to Geliman, not knowing that all rights under the settlement agreement had been assigned to Design Window; (5) on July 7, 2006, in a brief submitted to the Court, Geliman represented that its financial condition was stable and that its chance of bankruptcy was "remote"; (5) on July 20, 2006, Geliman's board of directors formally resolved to file a concurso (bankruptcy) proceeding in Argentina; (6) on August 15, 2006, the Court, by agreement of the parties, issued its letter/directive addressing the remaining disputes between the parties; (7) on August 29, 2006, Geliman filed the concurso proceeding; (8) on November 27, 2006, Geliman disclosed the existence of the concurso proceeding to the Court and DI; (9) on May 7, 2007, DI received a translated copy of Dr. Rovira's report on the ramifications of the concurso proceeding, in which it is disclosed that Geliman never owned the trademarks in issue in the litigation and that the Assignment Agreement had been executed in February 2006;[10] (10) Geliman did not disclose the existence of this litigation or the Assignment Agreement to the

_____

[10] Geliman's attorney asserts that he disclosed the fact that Geliman was the non-exclusive licensee of the intellectual property rights at issue in the litigation in November 2006, when he also indicated that the principals of Geliman wanted to transfer the rights to the intellectual property to Design Window. (See Griffith Decl., ¶ 44.)

24

concurso Trustee until August of 2007, after DI sought to vacate the settlement agreement.

In response, Geliman contends that the commencement of the suit in the name of Geliman, S.A. was an inadvertent error.[11] Geliman was merely a non-exclusive licensee of the intellectual property at issue in this litigation, while the actual owners and licensors were the principals of the business — Alfredo Tubert, his wife, Irene Tubert, and their business partner, Ian Haftel. (See Declaration of Alfredo Tubert in Opposition to Motion to Vacate Settlement, dated Aug. 13, 2007 ("Tubert Decl."), ¶ 9.) According to Mr. Tubert, he never focused on the distinction between the corporate entity known as Geliman and the individuals who owned the company. Thus, when he referred to Geliman in the Complaint, he "mistakenly interpreted the term "Geliman" to refer broadly to [his] business in the manner that [he] always used that term." (Id. ¶ 12.) Tubert further asserts that DI was not prejudiced by the error because it was aware of various legal entities used in conducting Tubert's gel business, including Design Window, which regularly invoiced DI, and to whom DI often sent payments for gel product. (See id. ¶ 13.) Moreover, the term sheet reflecting the initial oral settlement agreement indicated that the settlement was

---

[11] Tubert contends that if the action had continued, Geliman would have amended the Complaint to properly reflect the owners of the intellectual property. No such opportunity arose because the settlement agreement was reached within days of the filing of the First Amended Complaint.

being entered into not just by Geliman, but by Alfredo and Irene Tuber, Ian Haftel, and Design Window. Thus, all of the parties with ownership interests in the intellectual property were agreeing to be bound by the settlement agreement and were prepared to issue releases to DI. Finally, according to Geliman, DI was aware that Alfredo Tubert was the registered owner of the trademarks Gel&Man & GelGems in Argentina, because DI filed a competing application in Argentina for the GelGems mark. (See id. ¶ 13.)

As for the Assignment Agreement, Tubert contends that it was in no way foreclosed by the settlement agreement, and there was no need to advise DI about it. While the settlement agreement called for Geliman to receive commission payments and certain intellectual property from DI, Geliman was defined in the terms sheets as identifying the Tuberts, Ian Haftel, and Design Window, collectively.

A. Fraud on the Court

> Fraud on the court, as distinguished from fraud on an adverse party, is limited to fraud which seriously affects the integrity of the normal process of adjudication. Fraud upon the court should embrace only the species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases. Fraud upon the court must be established by clear and convincing evidence.

King v. First American Investigations, Inc., 287 F.3d 91, 95 (2d Cir. 2002) (internal citations and quotation marks omitted); accord Transaero, Inc. v. La Fuerza Area Boliviana, 24 F.3d 457, 460 (2d

Cir. 1994).

Although the fraud on the court doctrine was principally "conceived to vacate judgments induced by fraud," <u>Leeber-Krebs, Inc. v. Capitol Records</u>, 779 F.2d 895, 900 (2d Cir. 1985), it "has always been characterized by flexibility which enables it to meet new situations which demand equitable intervention." <u>Id.</u> at 899. Thus, in order to prevent a party from benefitting from a judgment induced by fraud, "the Supreme Court [has] recognized that the relief devised [for fraud on the court] may take several forms: including setting aside a judgment to permit a new trial, altering the terms of a judgment, or restraining the beneficiaries of a judgment from taking any benefit whatever from it." <u>Id.</u> at 900.[12]

> [F]raud upon the court occurs where a party has acted knowingly in an attempt to hinder the fact finder's fair adjudication of the case and his adversary's defense of the action. In other words, a fraud upon the court occurs where it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense.

<u>McMunn v. Memorial Sloan-Kettering Cancer Ctr.</u>, 191 F. Supp. 2d 440, 445 (S.D.N.Y. 2002) (quoting <u>Skywark v. Isaacson</u>, 1999 WL

---

[12] DI originally sought relief under Fed. R. Civ. P. 60(b) and the inherent authority of the Court. However, it is no longer relying on Rule 60(b), nor can it, since Rule 60(b) provides for relief from judgments and orders entered by the Court, and there has been no judgment or order entered by the Court.

1489038, at 14 n. 27 (S.D.N.Y. Oct. 14, 1999) (Report and Recommendation), adopted at, 2000 WL 145465 (S.D.N.Y. Feb. 9, 2000), and Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989)).

Although the Court is admittedly troubled by aspects of Geliman's conduct during this proceeding, the Court ultimately concludes that Plaintiff's conduct does not merit the relief Defendant seeks on the basis of fraud on the court. As an initial matter, in order to invoke the Court's inherent authority to impose sanctions, there must be a showing of bad faith. See Schlaifer, 194 F.3d at 336 ("In order to impose sanctions pursuant to its inherent power, a district court must find that: (1) the challenged claim was without a colorable basis and (2) the claim was brought in bad faith, i.e., motivated by improper purposes such as harassment or delay.").

In that regard, the Court views the misstatement in the Complaint — to the effect that Geliman owned the trademarks in issue — as the only possible basis for such relief. Geliman cannot be viewed as acting in bad faith by filing a bankruptcy proceeding in Argentina — an event which, no doubt, it would have chosen to avoid. Nor can the Assignment Agreement with Dynamic Window be viewed as bad faith conduct which resulted in a fraud on the Court. While the assignment may have had an impact on DI, and the Court firmly believes that Geliman should have promptly informed DI of

28

the assignment, it did not hamper this Court's ability to adjudicate the matters in issue. Indeed, by the time the assignment took place, the parties had already agreed to most of the settlement terms.

Geliman's representation in the Complaint that it was the registered owner in Argentina of the trademarks Gel&Man and GELGEMS, when, in fact, the marks were owned by the Tuberts, who are the principals of Geliman, is more troubling. Even if, as Tubert claims, the misstatement was inadvertent, the error went uncorrected throughout the extended period of the settlement discussions.[13] Moreover, that misstatement of fact, whether inadvertent or grossly negligent, had implications with respect to various defenses Defendants could have asserted, some of which may have affected the Court's subject matter jurisdiction.[14]

_____

[13] This omission, as well as other actions taken by Geliman that gave rise to the instant motion, appear to have resulted from Geliman's failure to adequately communicate and consult with its counsel. (See, e.g., Jan. 23 Tr. at 5 ("And it is a shame in retrospect that since the pendency of this lawsuit that Geliman didn't have the foresight to include their United States lawyers in the drafting of these agreements."), at 12 ("as soon as their US lawyers found about [the bankruptcy proceeding] it was disclosed").)

[14] The Court notes, however, that a party need not be an owner or registrant of a mark in order to assert a claim for infringement under certain provisions of the Lanham Act. See 15 U.S.C. § 1125 (a) (1); accord Havana Club Holdings, S.A. v. Galleon S.A., 203 F.3d 116, 130 (2d Cir. 2000) ("To establish standing under section 43(a), the plaintiff must demonstrate 'reasonable interest to be protected' against the advertiser's false or misleading claims, and a 'reasonable basis' for believing that his interest is likely to be damaged by the false

29

Nevertheless, it is difficult to attribute improper purpose to the misstatement, as there is no evidence that Geliman had anything to gain by failing to reveal that its principals, rather than the company itself, owned the trademarks. Moreover, Geliman made clear that its principals, as well as the company, were prepared to be bound by the settlement agreement. There is simply no basis to conclude, no less clear and convincing evidence, that the misstatement as to the ownership of the trademarks was intended to deceive the Court or Defendants, that it was done in bad faith, or was calculated to undermine the integrity of this Court's adjudicative process. See Gleason v. Jandrucko, 860 F.2d 556, 560 (2d Cir. 1988) ("Absent the type of fraud which subverts the integrity of the court itself, or is . . . perpetrated by officers of the court, the requisite interference with the judicial machinery cannot be established and an independent action for fraud on the court therefore will not lie. In short, neither perjury nor non-disclosure, by itself, amount to anything more than fraud involving injury to a single litigant."); Stouffer v. ABC Corp.,

---

or misleading advertising. The 'reasonable basis' prong embodies a requirement that the plaintiff show both likely injury and a causal nexus to the false advertising. . . . [I]t is apparent that, at a minimum, standing to bring a section 43 claim requires the potential for a commercial or competitive injury."); Prince of Peace Enterps., Inc. v. Top Quality Food Market, LLC, No. 07 Civ. 00349 (RJH), 2007 WL 704171, at *4 (S.D.N.Y. Mar. 7, 2007) ("Courts have consistently recognized that [the] broad language [of 15 U.S.C. § 1125(a)] confers standing on trademark licensees.").

30

221 F. Supp. 2d 425, 444 (S.D.N.Y. 2002) (clear and convincing evidence of submission of multiple falsified documents to the court, as well as untruthful testimony, constituted fraud on the court); cf. McMunn, 191 F. Supp. 2d at 445 ("It is well-settled, however, that an isolated instance of perjury, standing alone, will not constitute fraud upon the court.").

Finally, the Court seriously questions whether, given the present absence of subject matter jurisdiction over this action, relieving the parties of their obligations under their private settlement agreement would be a sanction that the Court could appropriately impose.[15] First, it is not apparent to the Court that the relief DI seeks — vacating the settlement agreement — corresponds to the alleged misconduct — fraud on the Court through a misrepresentation in the Complaint. Moreover, while there is no doubt that a court which has been deprived of subject matter jurisdiction still retains the power to impose sanctions for contempt of court, or Rule 11 violations, or other misconduct before the court, that authority is premised on the fact that these sanctions involve "collateral issues" related to a party's or attorney's conduct before the Court, and it does not entail "a district court adjudicating the merits of a 'case or controversy'

---

[15] The Court expresses no view as to whether, in light of its overall conduct and failures to disclose, Geliman would be successful in enforcing the settlement agreement in another action or forum.

over which it lacks jurisdiction." Willy, 503 U.S. at 138, 112 S. Ct. at 1080-81; Schlaifer, 194 F.3d at 333 ("The District Court clearly had jurisdiction to impose sanctions irrespective of the status of the underlying case because the imposition of sanctions is an issue collateral to and independent from the underlying case."). There is a substantive and qualitative difference between a court's vindication of its authority through the post-jurisdiction imposition of sanctions — such as costs, attorneys' fees, or a finding of contempt — and granting a party equitable relief by relieving it of its obligations under a negotiated settlement agreement. Indeed, the equitable relief DI seeks would most impact Dynamic Window, which is not a party to this action or before the Court in any capacity.

For all of these reasons, the Court recommends that this action be dismissed with prejudice for lack of subject matter jurisdiction, but that the District Court not employ its inherent sanction authority to vacate the parties' settlement agreement.[16]

---

[16] The Court need not address the issue of whether there was ever subject matter jurisdiction over this action because, even if there was not, the only relief to be afforded DI would be dismissal of the action. The presence or absence of subject matter jurisdiction has no bearing on the parties' ability to enter into a settlement agreement. Contrary to DI's contention, the Court did not enter any orders regarding the settlement agreement, for which it lacked jurisdiction. Rather, the parties merely agreed that if they had any disagreements about how their agreement would be reduced to writing, they would ask the Court to resolve them. The Court did so on one occasion, and provided its solutions to the parties in the August 15, 2006 letter; but it did not act in its judicial authority by entering orders

32

Respectfully submitted,

THEODORE H. KATZ
UNITED STATES MAGISTRATE JUDGE

Dated: February 11, 2008
       New York, New York

---

compelling relief for either party.